UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -X

AMARDEEP SINGH GILL,

                    Plaintiff,


     - against -                              ORDER

                                             CV 93-1597 (MDG)

BOARD OF THE NATIONAL CREDIT UNION
ADMINISTRATION, AS LIQUIDATING AGENT
FOR SIKH FEDERAL CREDIT UNION,

                    Defendant.

- - - - - - - - - - - - - - - - - - -X

GO, Magistrate Judge:

     Plaintiff Amardeep Singh Gill ("Gill" or "plaintiff"),

plaintiff pro se,[1] brings this diversity action seeking

compensatory and punitive damages as a result of the repossession

by Sikh Federal Credit Union ("Sikh Federal"), a New Jersey credit

union, of a used Lincoln Town Car that plaintiff had purchased with

the proceeds of a loan from Sikh Federal and used as a radio cab.

Shortly after plaintiff commenced this action, the National Credit

Union Administration ("NCUA" or "defendant") placed Sikh Federal

into involuntary liquidation and, as the successor in interest to

all of Sikh Federal's rights, was substituted for Sikh Federal as

defendant in this action.

-----

     [1] At the commencement of this action, plaintiff was
represented by attorney Krishna M. Vempaty, who subsequently was
granted leave to withdraw as counsel, with his client's consent, at
a conference held on May 5, 1995.  See minute entry and conference
calendar (DE 16) for 5/2/1995.

The defendant has moved for summary judgment dismissing all of plaintiff's claims in this action and seeking judgment on the Board's counterclaim for $24,282 for the amount of three loans outstanding against plaintiff. Plaintiff cross-moved to amend the complaint. By consent of the parties, pursuant to 28 U.S.C. § 626(c), this matter was reassigned to me for all purposes.

## PROCEDURAL BACKGROUND

Challenging the right of Sikh Federal to repossess the vehicle and the conduct of Sikh Federal when repossessing the vehicle and subsequent conduct, plaintiff asserts what he denominates as ten causes of action: (1) the security agreement was defective and unenforceable because it did not identify the collateral at the time of its signing; (2) the defendant failed to give notice to plaintiff prior to repossession, in violation of the security agreement and the N.Y. Uniform Commercial Code ("UCC") § 9-501; (3) the defendant's agent named "Mastrogiacomo," who repossessed the vehicle, breached the peace in doing so, in violation of the UCC and the terms of the loan agreement; (4) "defendants and its agents" committed trespass in repossessing the vehicle; (5) because "Mastrogiacomo" represented that he was a New York State detective, his taking of the vehicle violated plaintiff's constitutional rights under 42 U.S.C. § 1983; (6) the defendant converted the vehicle by failing to return it upon tender of payment, failed to properly care for it, and failed to return its contents; (7) the defendant's failure to return the vehicle upon payment of the full

loan amount constituted a violation of UCC § 9-506; (8) the defendant deprived plaintiff of his property under color of state law in violation of his constitutional right to due process under 42 U.S.C. § 1983; (9) the defendant failed to give plaintiff a copy of the security agreement when it was executed, in violation of the Federal Truth-in-Lending Act, and the security agreement improperly sets out the cost of finance; and (10) Sikh Federal's actions in failing to return the vehicle or give notice of repossession, and in contacting plaintiff's mother was "wanton, abusive and deliberate" and caused severe emotional distress to plaintiff and his mother in violation of UCC § 1-201(19).[2] See Complaint ("Compl.") (DE 1).

In its answer (DE 2), defendant asserted a counterclaim for breach of contract as a result of plaintiff's failure to make monthly payments required under three loans he obtained from Sikh Federal, for which $24,282.69 was then due and owing. See Answer and Counterclaim ("Answer") (DE 2). In his reply, plaintiff admitted that he had obtained the loans in the amounts alleged, but denied that they remained unpaid in the manner described by defendant. See DE 4.

Following completion of discovery, defendant moved for summary

_____

[2] Subsection (20) of Section 1-201 of U.C.C., which contains the definitions governing the U.C.C., simply sets forth the definition for "[g]ood faith." The Court assumes plaintiff apparently meant to refer to the covenant of good faith and fair dealing embodied in UCC § 1-304 specifying that "[e]very contract or duty within this act imposes an obligation of good faith in its performance and enforcement."

judgment dismissing the complaint.  <u>See</u> DE 36.  The parties

subsequently engaged in settlement discussions, but after the

discussions proved unproductive, this Court set a new schedule at a

conference on June 11, 1999 for the parties to re-brief defendant's

summary judgment motion and plaintiff's contemplated motion to

amend.  DE 47 (calendar entry June 11, 1999).  Plaintiff was

advised at the conference that failure to respond to the motion or

failure to controvert defendant's statement of material facts could

result in such facts being accepted as true.  <u>Id</u>.  Defendant then

filed a new motion and supplemental papers, including defendant's

statement pursuant to Local Rule 56.1 ("Def.'s 56.1 Statement").

<u>See</u> DE 49, 50, 51, 52.  Plaintiff responded by submitting a

proposed amended complaint dated July 4, 1999 and a Memorandum of

Law in support of his motion to amend and in opposition to the

motion for summary judgment dated August 23, 1999.[3]  Plaintiff did

not file any factual affidavit, or any statement controverting the

allegations of defendant's 56.1 Statement or defendant's

Supplemental Statement of Facts dated July 1, 1999 (DE 49).

PERTINENT FACTS

Although the record submitted with the motion is spare, the

following material facts concerning the loans plaintiff obtained

from Sikh Federal are undisputed and are based primarily on

plaintiff's pleadings, his deposition testimony and documents he

---

[3]  None of plaintiffs documents were entered on the docket
sheet.  Copies will be submitted herewith to the Clerk of the Court
for docketing.

-4-

signed.

Plaintiff is a member of Sikh Federal and, prior to February 22, 1992, had obtained two personal loans from Sikh Federal – the first loan on or about July 26, 1991 for $5,000 and a second loan on or about January 27, 1992 for $6,000. See Compl. at ¶ 7; Transcript of plaintiff's deposition taken on November 18, 1994 ("Pl. Dep.") at 14-15, attached as Exh. D to the Affidavit of Roger A. Goodnough ("Goodnough Aff.")[4] dated May 2, 1997 (DE 55); Pl-Dep. Ex. Q. On February 22, 1992, plaintiff submitted an application for a $12,500 loan from Sikh Federal and obtained the loan on the same day (the "Auto Loan") for the purchase of a vehicle to be used as a limousine. See Compl. at ¶¶ 5, 6 (DE 1); Pl. Dep. at 16; Pl-Dep. Ex. A (application for Auto Loan). Specifically, as plaintiff testified and indicated in his loan application, plaintiff sought the loan in order to buy a used beige/brown 1987 Lincoln Town Car, with VIN # 1LNBM82F6HY613701. See Pl-Dep. Ex. A at 1; see also Compl. at ¶ 5; Pl. Dep. at 16-17.

The Auto Loan is evidenced by a Promissory Note and Security Agreement signed by plaintiff on February 22, 1992 ("Loan Agreement"), which is a part of a two page form document which also contains a section for credit insurance and truth-lending

---

[4] In his affidavit, Mr. Goodnough attached the transcript of plaintiff's deposition and the exhibits marked at that deposition. See Ex. D (Pl.'s Dep.) and E (exhibits), Goodnough Aff. (DE 55). Hereafter, this Court will refer to the marked deposition exhibits by their deposition exhibit numbers preceded by "Pl-Dep. Ex." At the time of plaintiff's deposition, he was still represented by his original attorney, Krishna Vempaty.

disclosures.  <u>See</u> Pl-Dep. Ex. C; <u>see also</u> Exhibit A, NCUA
Supplemental 56.1 Statement (DE 49); Pl. Dep. at 20-23.  The Loan
Agreement consists of a section entitled "Note" setting forth the
terms of repayment and a section entitled "Security Agreement"
describing the remedies available to Sikh Federal after default.
<u>See</u> Pl-Dep. Ex. C.  The Note requires that the loan be repaid with
interest at the rate of twelve (12%) percent in forty-eight (48)
equal installments of $346.09 beginning March 22, 1992.  <u>See</u> <u>id.</u>;
<u>see</u> <u>also</u> Pl-Dep. Ex. A at 2 (loan application describing loan
terms).  The Note also states that "You will be in default if you
fail to make any payment on time."  Pl. Dep. Ex. C at 2.

    Both the Note and Security Agreement contain a provision
stating that "[w]hen you are in default, the credit union can
demand immediate payment of the entire unpaid balance of this loan"
and contain cross default provisions.  <u>Id.</u>  The Security Agreement
further states that Sikh Federal "can take possession of the
collateral without judicial process and without giving advance
notice provided it can do so without breach of the peace."  <u>Id.</u>  In
addition, the Security Agreement provides that "the Credit Union
will not be responsible for any of your property not covered by
this Agreement that you leave inside the collateral."  <u>Id.</u> at 2.
Just above the signature line at the bottom of the first page of
the Loan Agreement is a warning in relatively large, bold typeface
cautioning the signatory to read the terms before signing.  <u>Id.</u> at
1.

    When plaintiff initially signed the Loan Agreement, the space

for the listing of collateral was left blank, but plaintiff understood that the loan was made to purchase a vehicle. <u>See</u> Compl. ¶ 5; Answer at ¶ 5; <u>see</u> NCUA Supplemental 56.1 Statement ¶ 1 (attaching two copies of the Loan Agreement as Exhibit A, one with the collateral section of the Security Agreement left blank and one with the space for collateral filled in). Thereafter, Sikh Federal filed a notice of lien on the vehicle with the New York State Department of Motor Vehicles which are contained in the files of Sikh Federal. <u>See</u> Notice of Recorded Lien (attached as Exhibit B to NCUA Supplemental 56.1 Statement ¶ 2).

After signing the Loan Agreement, the plaintiff did not make payments as required by either the Loan Agreement or by his two other loans from Sikh Federal. He testified that the payments he made in 1992 were "small amounts" for less than shown on his loan schedule, and his payments in the fourth quarter of 1992 for all three of these loans totaled only $286.99 -- an amount insufficient to constitute even one payment on the Auto Loan. <u>See</u> Pl. Dep. at 30, 80-82, 88; Pl-Dep. Exs. D, M, N, Q (copies of checks and receipts of cash payments he claimed represented the payments made). Plaintiff made no payments in 1993. <u>See</u> Pl. Dep. at 82.

Sikh Federal sent a Loan Payment Delinquency Notice bearing date stamps of August 18, 1992 and September 15, 1992, which plaintiff acknowledged receiving and returning to the credit union with a handwritten letter dated October 9, 1992. <u>See</u> <u>id.</u> at 36-38;

Pl-Dep. Ex. E.[5] Plaintiff wrote in the letter that the notice was
defective, incomplete and inaccurate because it referred to
plaintiff as Amardeep Singh, without including Gill. See id. at
36-38 (discussing Pl-Dep. Ex. E). By letter dated January 15, 1993
addressed to the Director of Sikh Federal, plaintiff expressed his
regrets that he was "seriously delinquent" in his terms and
suggested a new payment schedule. See Pl. Dep. at 147-45.

On February 18, 1993 at approximately 4:00 p.m., an employee
of On the Job Detective Agency, an independent contractor retained
by Sikh Federal, repossessed the above-mentioned vehicle without
prior notice to plaintiff. Compl. at ¶ 11; Answer at ¶¶ 11, 14.
Plaintiff was alerted by his mother, Amrit Kaur, not a party to
this suit, who noticed from the window that someone was attempting
to drive away with plaintiff's vehicle. See Compl. at ¶¶ 10, 11.
The person showed plaintiff a shield and said that he was a New
York State police detective acting on behalf of Sikh Federal, which
was repossessing the vehicle. See Compl. at ¶ 11. After what
plaintiff characterizes as "heated arguments," the individual drove
away the vehicle, leaving a business card with the name Angelo
Mastrogiacomo ("Mastrogiacomo"). See Compl. at ¶ 10. Plaintiff
testified that Mastrogiacomo broke the door computer code and alarm
systems to enter the vehicle, damaged the ignition steering column,
and did not hand the contents of the vehicle to him. Compl. at

---

[5] At plaintiff's deposition, Sikh Federal also presented
plaintiff with a Loan Payment Delinquency Notice dated November 24,
1992, which was marked "Final," that plaintiff claims he could not
recall seeing. See Pl. Dep. at 40-41 (discussing Pl-Dep. Ex. F).

¶ 12; Pl. Dep. at 51-52. Plaintiff further claims that after this incident, both he and his mother, Amrit Kaur, received harassing telephone calls related to the vehicle and its repossession. See Pl. Dep. at 66-67; Compl. at ¶ 13.

Plaintiff testified that he did not get a copy of the Loan Agreement until March 7, 1993, when Ram R.P. Singh, Chief Executive Officer of Sikh Federal, gave him a copy at the Sikh Temple in Queens, where the credit union has an office. See Pl. Dep. at 23-26. At that time, plaintiff renegotiated his three loans with Sikh Federal and signed new notes. See id. at 31-34, 82-83; Pl-Dep. Ex. D (Auto Loan); Pl-Dep. Ex. P (other two loans); see also Compl. ¶ 15. With respect to the Auto Loan, he signed both a Note in the amount of $12,914.34, as well as a Truth-in-Lending disclosure statement. See Pl-Dep. Ex. D. Plaintiff also signed a letter agreement with Ram R.P. Singh which was dated March 8, 1993 and written on Sikh Federal letterhead, which directed plaintiff's employer, TRW Express ("TRW"), to make monthly payments of $125 to Sikh Federal and, ultimately, brought this action. Id. at 47. However, plaintiff did not submit the letter to his employer. Id.

After his car was repossessed, plaintiff had discussions over the phone and in-person at the Sikh Federal office to ascertain the amounts due on his three loans. See Pl. Dep. at 42-32 (discussing handwritten mathematical calculations written on Ex. G). On or about March 19, 1993, plaintiff delivered three certified checks in the amounts of $6,258.50, $3,648.07 and $14,376.12 (totaling $24,282.69) to Sikh Federal at its New Jersey office, which

-9-

represented the full amounts then due on the three loans from Sikh Federal. Pl. Dep. at 56; Pl-Dep. Exs. K, L. Plaintiff executed a letter agreement with Ram R.P. Singh dated March 19, 1993 written on Sikh Federal letterhead in which Mr. Singh acknowledged receiving from plaintiff three checks totaling $24,282.69 and agreed to return plaintiff's car that had been repossessed. See Pl. Dep. at 48-50; Pl-Dep. Ex. K. Although plaintiff acknowledged at the bottom of the letter that "I have received the above mentioned car in the [sic] as is condition, and I have no claim of any sort against Sikh FCU," he was told to sign the agreement before he could see his car. Id. at 48-50; Pl-Dep. Ex. K. The agreement also states that the car is being returned to plaintiff in the "condition in which it was repossessed." Id. However, plaintiff then refused delivery of the car because he decided it was not in good condition as he had agreed with Sikh – specifically, that the car alarm system had been broken during the repossession and a screw driver inserted into the ignition. See Pl. Dep. at 50-52. Although the parties dispute whether Sikh Federal officials returned the three checks to plaintiff, plaintiff admitted in his deposition that the monies represented in these checks were subsequently re-credited to his account by the issuing bank. See Pl. Dep. at 57-58;[6] NCUA's 56.1 Statement dated May 2,

---

[6] Plaintiff initially testified that he could not recall whether his checking account statement showed that the checks had been cashed, he later stated in his correction sheet to the deposition transcript that there was "no evidence of encashment of the certified checks." Plaintiff's Responses to Document Requests
(continued...)

1997, ¶ 8 (uncontroverted by plaintiff). Plaintiff also testified that although TRW had faxed him a claim for the radio in his vehicle, TRW had not sued him for the radio. See Pl. Dep. at 96-97.

On or about August 9, 1993, the NCUA placed Sikh into involuntary liquidation and became the successor in interest to all of Sikh's loans. See endorsed order dated 11/3/1993; NCUA 56.1 Statement ¶¶ 9-10.

The NCUA concluded, upon its review of Sikh Federal's records, that prior to the repossession, plaintiff was 11 months past due on the auto loan, 5 months past due on the $5,000 loan, and 6 months past due on the $6,000 loan. See letter of NCUA dated May 10, 1994 addressed to Krishna Vempaty; Pl- Dep. Ex. Q; Pl. Dep. at 63 (plaintiff's counsel stipulated on the record that plaintiff had probably received the letter).

In addition to his three loans from Sikh Federal, plaintiff signed as the guarantor on a loan the credit union made to his friend, Inderbir Singh Gill, on February 22, 1992, at the same time as the Auto Loan. See Pl. Dep. at 18-20, 92-93; see also proposed amended Compl. ¶ 16.

The Proposed Amended Complaint

In his proposed amended complaint, plaintiff asserts thirty-two separate causes of action, and adds seven defendants who were

_____

[6](...continued)
at his deposition attached to the letter dated February 1, 1995 of Krishna Vempaty.

not previously parties to this action:  Ram R.P. Singh; Surinder Singh, a family member of Ram R.P. Singh; Inderbir Singh Gill, the guarantor of one of plaintiff's loans and the maker of the loan referenced above, which plaintiff guaranteed, but which is not the subject of this lawsuit; Tony Cera, an alleged employee of On the Job Detective Agency (who apparently is alleged to be "Mastrogiacomo," see proposed amended Compl. ¶ 42); the Director of the NCUA, and its board as liquidating agent; Account Services, Inc. ("Account Services"), a collection agency; and the Asta Group, another collection agency.

The claims plaintiff asserts as Counts 1, 2, 4-6, and 8-13 of the proposed amended complaint duplicate claims in the original complaint.  The remaining claims are causes of action alleging: (3) Ram R.P. Singh knowingly and purposefully caused plaintiff's damages, and therefore the corporate veil should be pierced; (7) Sikh Federal failed to surrender the limousine's license plates to the New Jersey or New York Department of Motor Vehicles, in violation of the rules and regulations of the New York City and New Jersey Taxi and Limousine Commissions; (14) Surinder Singh issued defective receipts for payments by plaintiff and failed to issue a pass book in violation of "Chapter VII of 12 U.S.C."; (15) Surinder Singh illegally drove the vehicle, even after insurance was cancelled, in violation of the criminal laws and traffic laws; (16) Inderbir Singh Gill failed to pay back amounts loaned to him by Sikh Federal, which rendered plaintiff, as his guarantor, liable and damaged plaintiff's credit; (17) an individual now identified

-12-

as "Tony Cera" stole the limousine and should be punished
criminally and have his license suspended; (18) Tony Cera violated
42 U.S.C. § 1983; (19) On The Job detective agency stole the
limousine and vandalized it in violation of New York business and
criminal laws, United States criminal laws, and the New York City
Taxi and Limousine Commission rules; (20) On The Job is liable for
the wrongful acts and false representations of Cera under 42 U.S.C.
§ 1983; (21) the NCUA "witness-tampered" with the plaintiff by
attempting to collect the debt, even though the loan was paid in
full, violating 18 U.S.C. § 1512; (22) the NCUA violated the Fair
Credit Reporting Act, 15 U.S.C. § 1681 et seq., by ruining
plaintiff's credit rating despite the fact that the loans were paid
in full; (23) the NCUA brought an action against plaintiff, without
making any good faith attempt to collect the outstanding debt of
Inderbir Singh Gill, and sued plaintiff even though that action
should have been brought against Inderbir Singh Gill, in violation
of the federal Fair Debt Collection Practices Act, 15 U.S.C. § 1692
et seq. ("FDCPA") and the due process clause of the United States
Constitution; (24) the Director of the NCUA directed the NCUA to
act in the illegal manner described, and therefore should be
personally liable; (25) Accounts Services sent letters and numerous
harassing phone calls which violated § 1692 of the FDCPA because it
was aware that litigation was going forward; (26) Account Services
did not cease communications with plaintiff, even though it knew
plaintiff had paid his debt and had requested that communications
cease in violation of § 1692(c)(c) of the FDCPA; (27) Account

Services reported plaintiff to credit bureaus and ruined his credit in violation of FDCPA § 1692; (28) Account Services did not seek payment from Inderbir Singh Gill before seeking payment from plaintiff in violation of the FDCPA; (29) Asta Group sent letters and made harassing phone calls to plaintiff in order to collect the debt of Inderbir Singh Gill in violation of FDCPA § 1692; (30) Asta Group did not cease communications with plaintiff when requested and properly notified, in violation of the FDCPA; (31) Asta Group reported plaintiff to a debt collection agency, violating the FDCPA; and (32) Asta Group failed to make a good faith effort to collect debt from Inderbir Singh Gill in violation of FDCPA.

## DISCUSSION

Summary judgment is appropriate pursuant to Fed. R. Civ. P. 56 when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Citizens Bank of Clearwater v. Hunt, 927 F.2d 707, 710 (2d Cir. 1991) (citations omitted). The moving party bears the initial burden of demonstrating an absence of material facts and once it has done so, the burden shifts to the non-moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In determining whether there is a genuine issue of material fact, the court must resolve ambiguities and draw inferences in favor of the non-moving party. Id. at 330 n.2; Capital Imaging Assocs., P.C. v. Mohawk

<u>Valley Med. Assocs., Inc.</u>, 996 F.2d 537, 542 (2d Cir. 1993).  A party opposing summary judgment must present "significant probative" supporting evidence that a factual dispute exists. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986); Fed. R. Civ. P. 56(e).

Where, as here, a litigant appears <u>pro se</u>, these same standards for dismissal apply, but a court must give the <u>pro se</u> litigant special latitude in responding to a summary judgment motion.  <u>See</u> <u>McPherson v. Coombe</u>, 174 F.3d 276, 280-81 (2d Cir. 1999) (courts "read the pleadings of a pro se plaintiff liberally and interpret them to raise the strongest arguments that they suggest") (internal quotation marks and citation omitted); <u>see also</u> <u>Ferran v. Town of Nassau</u>, 471 F.3d 363, 369 (2d Cir. 2006) ("This Court will construe briefs submitted by *pro se* litigants liberally").  In particular, the <u>pro se</u> party must be given express notice of the consequences of failing to respond appropriately to a motion for summary judgment. <u>See</u> <u>McPherson</u>, 174 F.3d at 281; <u>Vital v. Interfaith Med. Ctr.</u>, 168 F.3d 615, 620-21 (2d Cir. 1999); <u>Champion v. Artuz</u>, 76 F.3d 483, 486 (2d Cir. 1996); <u>Ruotolo v. IRS</u>, 28 F.3d 6, 8 (2d Cir. 1994).  However, a <u>pro se</u> party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment.  <u>Carey v. Crescenzi</u>, 923 F.2d 18, 21 (2d Cir. 1991).  Rather, to avoid summary judgment, the non-moving party must provide some basis for a finding that his or her "version of relevant events is not fanciful."  <u>Christian Dior-New York, Inc. v. Koret, Inc.</u>, 792 F.2d 34, 38 (2d Cir. 1986) (internal

quotation marks and citation omitted); <u>Matsushita Elec. Indus. Co.</u>
<u>v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986) (a non-moving party
"must do more than simply show that there is some metaphysical
doubt as to the material facts").

Before discussing plaintiff's claims, this Court first notes
two critical and undisputed facts which inform review of the
instant motions.  First, as an agency of the federal government,
the NCUA is entitled to certain legal defenses under federal law.
Congress has specifically provided in 12 U.S.C. § 1787(p)(2) that:

> No agreement which tends to diminish or defeat the right,
> title, or interest of the [NCUA] in any asset acquired by
> it under this subsection, either as security for a loan
> or by purchase, shall be valid against the [NCUA] unless
> such agreement ... shall be in writing ... shall have
> been executed by the credit union ... shall have been
> approved by the board of directors of the credit union
> ... [and] shall have been continuously ... an official
> record of the credit union.

In other words, insofar as plaintiff bases any claim on oral
promises made, such claims are not viable.  This statute codifies
the common law principle first recognized by the Supreme Court in
<u>D'Oench, Duhme & Co. v. FDIC</u>, 315 U.S. 447 (1942).  <u>See</u>, <u>e.g.</u>,
<u>Nat'l Credit Union Admin. Bd. v. Zovko</u>, No. 1:13 CV 1430, 2017 WL
4535070, at *4 (N.D. Ohio Jan. 27, 2017), <u>aff'd</u>, 728 F. App'x 567
(6th Cir. 2018), <u>cert</u>. <u>denied</u>, No. 18-74, 2018 WL 3428931 (U.S.
Oct. 1, 2018); <u>Nat'l Credit Union Admin. Bd. v. Madar</u>, No. 93 CV
3997, 1998 WL 386486, at *3 (E.D.N.Y. July 9, 1998); <u>National</u>
<u>Credit Union Admin. Bd. v. Glickman</u>, No. CV 92-1540 RR, 1993 WL
17436, at *2-3 (E.D.N.Y. Jan. 11, 1993).

Second, there is no dispute that prior to repossession of

plaintiff's Lincoln Town Car by an agent of Sikh Federal, plaintiff was in default of the Auto Loan. Thus, this Court will first address defendant's motion for summary judgment on its counterclaim first.

I. The Counterclaim

In its counterclaim, defendant seeks judgment on the outstanding amounts of the loans owed by plaintiff to Sikh Federal. The loans at issue totaled $25,500 and, by defendant's calculation, $24,282 remained outstanding on those loans on March 19, 1993. See Defendant's Counterclaim ¶¶ 2-4; Pl-Dep. Ex. K; Plaintiff's Reply to Counterclaims ¶¶ 1, 3, 4. As discussed, plaintiff was in default of these three loans.

Under New York law, the general requisites for formation of a contract include offer, acceptance, and consideration. See Restatement (Second) of Contracts §§ 24, 50, 71 (1981); Oscar Prods., Inc. v. Zacharius, 893 F. Supp. 250, 255 (S.D.N.Y. 1995). Plaintiff does not contest that he executed either the loan agreements or the March 19, 1993 agreement with Sikh Federal. Nor is there a material issue of fact that plaintiff tendered consideration of $24,282, as recited in the March 19, 1993 agreement, for "complete payment" of those loans, agreed to release his claims against Sikh Federal, and was tendered the vehicle in question in good working order (although plaintiff contends there was a problem with the alarms and a scratch on the right hand side

-17-

of the fender).[7]  See Pl. Dep. at 50-52.  Thus plaintiff entered

into a contract with Sikh Federal dated March 19, 1993 to repay

$24,282.69, and to release any claims against Singh, for which he

was to receive the return of the vehicle seized by Singh, which was

then tendered by Singh to plaintiff.  See Pl. Dep. at 50.

Nonetheless, plaintiff then repudiated his agreement with Sikh

Federal, refused delivery of the vehicle (Pl. Dep. at 50), and

brought suit.  When a party repudiates contractual duties prior to

the time designated for performance and before all of the

consideration has been received, the repudiation entitles the non-

repudiating party to cease performance as of that date, and "claim

damages for total breach."  Long Island R.R. Co. v. Northville

Indus. Corp., 41 N.Y.2d 455, 463 (1979); see Restatement (Second)

---

[7]  Plaintiff states in his proposed amended complaint and
deposition that he was told that the vehicle was in better
condition than it actually was, but was not shown the vehicle until
after he signed the agreement.  See Pl. Dep. at 49; proposed
amended complaint ¶¶ 32-33. Such allegations, even if true, would
not excuse plaintiff's conduct as to the March 19, 1993 agreement,
or render the March 19, 1993 agreement rescinded or terminated.
See 12 U.S.C. § 1787(p)(2).

According to plaintiff's own testimony, the only variations
between the reported condition of the car when it was tendered to
plaintiff and its actual condition were minor – a scratch on the
right of the fender and problems with the alarm system.  See Pl.
Dep. at 52.  However, only a material breach of the contract would
justify recission or termination.  Rawcliffe v. Aguayo, 438
N.Y.S.2d 697, 700 (Sup. Ct. Kings Co. 1981) (citing 6 Williston on
Contracts, 3d Ed. § 814) ("A material breach leaves less than
substantial performance, thus resulting in failure of the
constructive condition which discharges the promisor. Also it is
often said that a material breach results in failure of the
consideration for the defendant's promise, and this is regarded as
a defense sufficient to defeat liability").

-18-

of Contracts § 253. A repudiation can be either "a statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach" or "a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach." Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp., 92 N.Y.2d 458, 462-63 (1998) (internal quotation marks and citation omitted).

Plaintiff clearly repudiated his agreement with Sikh Federal by informing it he would not accept delivery of the vehicle in question and then, a month later, by suing Sikh Federal for damages relating to the repossession. Under these circumstances, Sikh Federal was entitled to cease performance of the agreement and seek damages for breach, which it did by retaining the vehicle, not depositing the checks (assuming it had possession of them), and bringing the counterclaims in this action. Plaintiff is therefore liable to Sikh Federal for breach of the March 19, 1993 agreement in the amount of $24,282.69, minus the value of the car as of the date it was repossessed, plus interest running from the date the car was repossessed.[8]

---

[8] In light of the language of the March 19, 1993 agreement in which Sikh Federal agrees to return the car in the "condition in which it was repossessed," the correct amount of offset is the value of the car in the condition and as of the date it was repossessed. In addition, it is worth noting that even absent the March 19, 1993 agreement, plaintiff has not raised a material issue of fact that he owed the amount set out in that agreement with regard to the relevant loans.

In response to defendant's arguments, plaintiff contends that defendant has not properly accounted for the monies owed by him.[9] However, plaintiff has submitted nothing at summary judgment by way of documentation, affidavit or accounting, to suggest that defendant's figures relating to the amounts owed to him on the loans are incorrect. Even if the defendant's figures are wrong, plaintiff, by his own testimony, conduct and writings admits that he was "seriously delinquent" in all three loans and owed over $24,000 by March 1993.

Defendant is therefore entitled to judgment as set out above, provided plaintiff does not have any viable claims to potentially set-off against the defendant's claim.

II. Plaintiff's Claims Should be Dismissed

    A. Validity of the Security Agreement

Plaintiff asserts as his "First Cause of Action" that he is entitled to damages because of the improper repossession of his vehicle by defendant's agent. Plaintiff argues that the security agreement at issue is invalid because the collateral was not adequately described in it at the time of signature of the

---

[9] In addition, plaintiff alleges that the loan agreement incorrectly calculated the interest due on his loan, which should have been (according to him) at the 12% interest rate, rather than the $3,468.29 cost of finance set out on the agreement. See Compl. ¶ 38. Plaintiff thus claims, in effect, that he was charged too little for his loan, and therefore misled by the disclosure statement. However, considering the amortization of the loan, the loan agreement accurately sets out the amount owed by plaintiff on a monthly basis, assuming payments on principal of 12% over 48 months. Moreover, the amount sought by defendant in this action is consistent with the loan agreement.

agreement, and the car therefore could not properly be repossessed.[10]

Generally, absent a writing signed by the debtor identifying the security at issue, no security interest in particular collateral will attach. See N.Y. UCC §§ 9-203, 9-204. Section 9-203(b) states in pertinent part that: a security interest is not enforceable unless (a) "the debtor has authenticated a security agreement that provides a description of the collateral. . ."; (b) "value has been given"; and (c) "the debtor has rights in the collateral." Section 9-204(a), in turn, permits a security agreement to cover "after-acquired collateral." "Security agreement" is defined as an "agreement which creates or provides for a security interest." Id. § 9-102(a)(74).

That the description of the collateral required by § 9-203 was entered on the security agreement after it was signed by both parties does not necessarily render the Security Agreement invalid. See In re Levine's Delicatessen & Rest., Inc., 53 B.R. 430, 432 (Bankr. S.D.N.Y. 1985) (later attachment of description of collateral to agreement previously signed by parties created valid security interest in property described; § 9-203 expresses "no requirement that all pre-requisites [to the creation of a secured

---

[10]   While this claim -- as well as many others here -- would be barred by the release in the March 19, 1993 agreement, defendant has not raised release as an affirmative defense in its pleadings and has not argued it at summary judgment. As such, that claim is waived. See Fed. R. Civ. P. 8(c); American Fed. Grp., Ltd. v. Rothenberg, 136 F.3d 897, 909-910 (2d Cir. 1998) (citing 5 Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure § 1278, at 491 (2d. ed. 1990)).

interest] be satisfied simultaneously.")  The court in _In re_
_Levine's_ considered the evidence in that case indicating without
contravention that the schedule describing the collateral was
prepared by agreement of both parties, and noted that the agreement
was signed first before any reference to the specific collateral
was made part of the agreement (including the words "see attached
listing" which were typed by a secretary in a space on the
agreement _after_ execution).  _See_ 53 B.R. at 431; _see_ _also_ _King v._
_Tuxedo Enters., Inc._, 975 F. Supp. 448 (E.D.N.Y. 1997)(security
agreement need not be embodied in a single formal document; various
documentation relating to loan viewed together indicated that
security interest in particular collateral was intended by parties
to agreement).

        Thus, the relevant question here is whether there are
material questions of fact as to whether the parties intended the
vehicle to be later purchased to act as security for the loan, even
though the collateral was not described at the time of the
execution of the loan, and whether the agreement adequately
identified the vehicle as collateral.  _See_ _In re Levine's_, 53 B.R.
at 432.  Notably, plaintiff does not argue or submit any evidence
that the limousine was not intended as the security for the loan,
that he did not understand it to be security, or that the loan was
not secured.  Nor is there any question that the vehicle at issue
was adequately identified by year, make, color and VIN number on
the Security Agreement.  Rather, plaintiff admits that the loan was
made in order to purchase the vehicle at issue and that he signed

what was clearly designated as a "security agreement" setting out the terms for the repossession of the collateral.  <u>See</u> Compl. ¶ 5; Pl. Dep. at 16, 21.  Critically, plaintiff's Town Car was specifically identified by VIN#, color and make on his loan application.  Further, plaintiff does not dispute receiving the notice of lien on the vehicle at issue sent to him by Sikh Federal; nor does the record of this matter contain any objection or action taken by plaintiff as a result of that lien.  Under these circumstances, as in <u>In re Levine's</u>, there is no material issue of fact that the parties intended to grant a security interest in the vehicle in question, and that the Security Agreement at issue fulfilled the requirements for creating such an interest.

   B. <u>Repossession</u>

    Plaintiff also argues that the repossession of the car, without prior notice to him, was improper under the terms of his security agreement.  <u>See</u> Compl., Second and Tenth Causes of Action. On the contrary, the Security Agreement expressly gives defendant the right to repossess the car at issue "without judicial process and without advance notice."  <u>See</u> Loan Agreement (NCUA Supp. 56.1 Ex. A).  In addition, defendant also had the right to repossess the car without prior notice to plaintiff under UCC § 9-609,[11] which confers on a secured party on default not only "the right to take possession of the collateral," but "to proceed without judicial process if this can be done without breach of the peace ..."

_____

    [11] UCC § 9-609 was formerly section 9-503.

Global Casting Indus., Inc. v. Daley-Hodkin Corp., 432 N.Y.S.2d
453, 455 (Sup. Ct. Nassau Co. 1980) (secured creditor had the right
under § 9-503 to take immediate possession upon default, even if
the default provisions of the contract do not provide such an
express right); MGD Graphic Sys., Inc. v. New York Press Publ'g Co.
Inc., 383 N.Y.S.2d 606 (1st Dept. 1976), aff'd, 42 N.Y.2d 1018
(1977).

Thus, Sikh Federal became entitled to immediate possession of
the vehicle both by virtue of the express provisions of the
security agreement and the provisions of UCC 9-609.  See Global
Casting, 432 N.Y.S.2d at 455.  As noted by the court in William
Iselin & Co., Inc. v. Burgess & Leigh Ltd., 276 N.Y.S.2d 659 (Sup.
Ct. N.Y. Co. 1967), "by virtue of the express provisions of the
security agreement and of the U.C.C. § 9-503, [the secured creditor
had the] right to take possession of the collateral, without
judicial process . . . ."  276 N.Y.S.2d at 661.

C. Crediting of Loan Payments

Plaintiff also contends that his payments on the loan at issue
were not properly credited, rendering the repossession improper.
See Compl. ¶ 8, Second Cause of Action.  In essence, plaintiff
appears to be contending that his payments (which plaintiff admits
were, in total, made in amounts far less than that required by the
loan agreement for the vehicle) should have been spread in a
different manner between the various accounts.  Insofar as
plaintiff is relying on an oral agreement regarding application of

payments, such an arrangement is precluded by the D'Oench Dhume
doctrine. However, plaintiff would still not have avoided a
default regardless of how the insufficient payments made by
plaintiff were spread given how seriously delinquent he was in
payment.

   D. Breach of the Peace

   Plaintiff asserts in his Third Cause of Action that he is
entitled to damages for the purported breach of the peace and
trickery by defendant's agent, "Mastrogiacomo," as well as for
damage to the vehicle that occurred when the vehicle was taken by
the On the Job Detective agency on behalf of Sikh Federal. See
Compl., Third Cause of Action. However, the evidence plaintiff
alleges and described in his deposition as to breach of the peace
was that he argued with Mastrogiacomo and Mastrogiacomo then broke
into the car, took the key from plaintiff, and misrepresented his
identity.

   Although UCC § 9-609 gives a secured party the right to take
possession of the collateral and "proceed without judicial process
if this can be done without breach of the peace[,]" the UCC does
not set out what constitutes a breach of the peace under section 9-
609. Cherno v. Bank of Babylon, 282 N.Y.S.2d 114, 119 (Sup. Ct.
Nassau Co. 1967) (the statute "'makes no attempt to articulate the
standards for determining whether the repossession can be
accomplished without breach of the peace'") (citation omitted),
aff'd, 288 N.Y.S.2d 862 (2d Dep't 1968). Thus, determining what

-25-

constitutes a breach of the peace is construed according to the common law.  See Cherno, 282 N.Y.S.2d at 119.

Under the common law, a breach of the peace is "a disturbance of public order by an act of violence, or by an act likely to produce violence, or which, by causing consternation and alarm, disturbs the peace and quiet of the community."  People v. Most, 171 N.Y. 423, 429 (1902); Griffin v. Stanek, No. 95-CV-202, 1997 WL 394660 (N.D.N.Y. July 10, 1997).  Courts have found that breaking and entering (including entering into private real property) in an unauthorized manner in order to accomplish a repossession, without more, is not sufficient to constitute a breach of the peace.  See, e.g., Wombles Charters, Inc. v. Orix Credit Alliance, Inc., No. 97 CIV. 6186(JSM), 1999 WL 498224, at *2 (S.D.N.Y. July 14, 1999)(repossession accomplished by trespassing onto private property and breaking lock was not breach of peace); Cherno, 282 N.Y.S.2d at 119-120 (repossession by entry by use of unauthorizedly obtained key was not breach of peace where it produced from the landlord call to police and request that key be left); Global Casting, 432 N.Y.S.2d at 456 (breaking into business premises and changing locks and advising plaintiff's customers that the plaintiff was out of business was not breach of peace).

Moreover, while we could not locate a New York court that had addressed this issue, courts in other jurisdictions have found that the taking of a vehicle on default from a public location over the oral objection of the owner, however strenuous, is not a breach of

the peace unless accompanied by factors indicating that the
activities of the repossession agent are of a kind likely to cause
violence, or public distress and/or consternation.  See Clarin v.
Minnesota Repossessors, Inc., 198 F.3d 661, 664 (8th Cir. 1999).
In Clarin, decided under Minnesota UCC § 9-503, the court cited the
five-factor test set out in one treatise for determining whether a
repossession was a breach of the peace:

> (1) where the repossession took place, (2) the debtor's
> express or constructive consent, (3) the reactions of
> third parties, (4) the type of premises entered, and (5)
> the creditor's use of deception.

Id. (citing 2 J. White & R. Summers, Uniform Commercial Code § 27-6
at 575-76 (3d ed. 1988)).  In this regard, "as a repossession moves
farther from the debtor's residence, the argument for a breach of
the peace becomes more tenuous."  Id. (citing White & Summers,
Uniform Commercial Code § 34-7 at 417 (4th ed. 1995)).

In Clarin, the repossession of a car occurred over the verbal
objection of the defaulting debtor who "ran outside and pleaded
with the [repossessors]" and a third party who intervened to assist
the debtor in obtaining her personal property and also protested
the repossession.  The Eighth Circuit held that this did not
constitute a breach of the peace because the repossession took
place in a public parking lot, the owner was given ample
opportunity to explore options by calling the police and her
creditor and the repossession company did not use trickery.  198
F.3d at 664; See, e.g., Rainwater v. Rx Med. Servs. Corp., 1995 WL
907888 (E.D. Cal. December 6, 1995) (even where there was issue of

fact whether defaulting debtor protested about repossession, in the absence of proof of the use of threat or violence against any person, there was no breach of the peace as matter of law); Chrysler Credit Corp. v. Koontz, 277 Ill. App.3d 1078 (Ill. App. Ct. 1996) (where creditor entered onto private property despite express instruction of defaulting debtor not to do so, and car owner yelled "don't take it" at repossession agent, no breach of peace occurred); Williams v. Ford Motor Credit Co., 674 F.2d 717 (8th Cir. 1982)(where repossession agents took car from driveway in middle of night, and defaulting debtor exited her home to "holler" at them and neighbors were awakened, there was no breach of peace as matter of law because there was no evidence to indicate that repossessor made threats toward owner or did anything which caused her to fear physical harm).  In this case, as in Clarin, the repossession agent broke into the car, while parked on a public the street.

Moreover, although plaintiff alleges he argued in a "heated" manner with "Mastrogiacomom," who misrepresented his identity, nothing in the record, including plaintiff's deposition testimony and pleadings, describe actions or discussions that caused consternation or alarm in any third party, or were of a kind likely to produce violence.[12]  Thus, I find that plaintiff has not

---

[12]  Plaintiff avers that the individual he identified as "Mastrogiacomo" was in fact not a police detective and someone of other name, and that the repossession was accomplished by means of trickery.  Plaintiff's statements relating to the "true" identity
(continued...)

presented any evidence that a breach of the peace occurred when the car was repossessed. Contrast, e.g., Hilliman v. Cobado, 499 N.Y.S.2d 610 (Sup. Ct. Cattaraugus Co. 1986) (breach of peace occurred where creditor entered onto private property of debtor who had not defaulted, violated warning of sheriff's lieutenant that he would be arrested if he took cattle which were collateral from property, created ruckus, and stated, over debtor's protest, "to hell with this, we're taking the cows").

Moreover, even assuming, arguendo, that a triable issue of fact exists on the issue of whether a breach of the peace occurred in this case, it is not necessary to reach and resolve these issues because they make little difference to the practical outcome of this case. Very simply, even if a breach of the peace were proven at trial, because plaintiff was clearly in default, plaintiff's damages in the present case would be limited to the damages caused by the breach of the peace -- i.e., the value of the damage to the car, which, at this time, amounts to the same damages as would be

---

[12](...continued)
of the individual who repossessed the car are at best hearsay and at worst pure speculation. See Pl. Dep. 80-81 (stating under oath that police officer told him person who repossessed car was a phony detective and that his actual name was "Anthony Carlieno"); compare proposed amended complaint at ¶¶ 27, 42 (claiming that name given to him by the same police officer was "Tony Cera" and referencing a "legally defective warrant of seizure" and police shield, none of which is in record). Importantly, there is no indication that the repossession was accomplished in a manner that actually tricked plaintiff in some way; plaintiff does not claim that he relied on any misrepresentation made by the employee of On the Job with regard to any aspect of the repossession, or that he believed the vehicle was not being repossessed.

available to him under the March 19, 1993 agreement.  See, e.g., Clark v. Assocs. Commercial Corp., 820 F. Supp. 562, 565 (D. Kansas 1993).  In Clark, the court held that the damages of a debtor who was in default and who had a viable claim for breach of the peace under Kansas UCC § 9-503 is limited to damages caused by the breach of peace itself.  Otherwise, the debtor would be put in a better position than if the creditor had fully performed its contractual obligations, since, under § 9-503, the debtor was not legally entitled to possession of the vehicle.  Id.; see, e.g., Borg-Warner Acceptance Corp. v. Scott, 86 Wash.2d 276 (1975)(defaulting debtor is entitled to damages caused by breach of peace, but not other damages); contrast, e.g., Hilliman, 499 N.Y.S.2d at 614 (debtor who had not defaulted was entitled to return of collateral); Barrett v. Harwood, 189 F.3d 297, 304 (2d Cir. 1999) (where plaintiff alleged he was not in default and there was allegation of physical battery and breach of peace in violation of § 9-503, plaintiff might be able to recover vehicle and damages in state-law action).  New York has a statute identical to the Kansas statute discussed in Clark. See N.Y. UCC § 9-609.

Moreover, regardless of whether a breach of the peace occurred, the punitive damages sought by plaintiff are not available here.  When a federal government entity acts as receiver for a failed financial institution, the governmental entity -- and the failed institution -- are generally not liable for punitive damages.  See Campbell v. FDIC, Civ. A. No. 93-3969, 1994 WL 475067

(E.D. Pa. Aug. 29, 1994)(no punitive damages in action under ERISA available against FDIC acting as receiver), aff'd, 58 F.3d 908 (3d Cir. 1995); Professional Asset Mgmt., Inc. v. Penn Square Bank, 566 F. Supp. 134, 136-37 (W.D. Okla. 1983)(no punitive damages available against FDIC); Tuxedo Beach Club Corp. v City Fed. Sav. Bank, 749 F. Supp. 635 (D.N.J. 1990) (same); In re Beitzell & Co. Inc, 163 B.R. 637, 657 (Bankr. D.D.C. 1993) (punitive damages not available against FDIC as receiver on tort claims).  The rationale behind this rule is that punitive damages intended to punish and deter a tortfeasor serve no purpose against a receiver or conservator which acts for the benefit of the institution's creditors, and, conversely harms those creditors.  See Tuxedo Beach, 749 F. Supp. at 649-50.  Thus, no punitive damages are available in this matter.

   E. Failure to Return Collateral on Demand

     Plaintiff alleges as his Seventh Cause of Action that the defendants failed to return the vehicle upon payment of the loan and his demand, violating N.Y. UCC § 9-506.[13]  However, there is no material issue of fact that, upon presentation of certified checks to Sikh Federal, the car was in fact tendered to plaintiff in working order and he refused that tender.  Under these undisputed circumstances, plaintiff has not raised a material issue of fact that the vehicle was not tendered to him.

_____

     [13] Section 9-506 was renumbered as section 9-623.

F.  Disposition of Collateral

Plaintiff alleges in the Sixth Cause of Action of the
Complaint that the defendant also converted the vehicle by not
taking appropriate care of it.  However, because plaintiff is
entitled, under any analysis, to the value of the vehicle as of the
time it was taken from him, and because plaintiff is not entitled
to punitive damages, as discussed below, any such "conversion"
makes no difference with regard to the outcome of this motion.

G.  Federal Truth in Lending Act

Plaintiff alleges in his Ninth Cause of Action that the
failure of Sikh Federal to give him a copy of the loan documents at
the time of its execution violated the Federal Truth in Lending
Act, 15 U.S.C. § 1601 et seq. ("FTLA").  However, that statute
applies only to non-commercial loans and expressly excludes from
its coverage "[c]redit transactions involving extensions of credit
primarily for business, commercial, or agricultural purposes."  15
U.S.C. § 1603(1).  Plaintiff's loan -- the one with regard to which
he claims he did not receive a copy of the loan documents -- was
expressly intended to permit his purchase of a limousine for
commercial purposes.

H.  Claims for Emotional Distress

Plaintiff seeks in his Tenth Cause of Action to plead a claim
for intentional infliction of emotional distress on behalf of
himself and his mother, Amrit Kaur, who is not named as a plaintiff

here. However, plaintiff has not raised a material issue of fact

that Sikh Federal (or the NCUA) was responsible for any action of

any person who may or may not have called plaintiff or his mother.

To the extent that plaintiff attempts to plead a claim on behalf of

his mother, plaintiff has not alleged any basis on which he could

assert a claim or recover damages on her behalf.

Also, in order to plead a claim for intentional infliction of

emotional distress, plaintiff must establish that he suffered

severe physical or emotional symptoms as a result of his distress.

See Howell v. New York Post Co., 81 N.Y.2d 115, 121 (1993); Elbogen

v. Esikoff, 697 N.Y.S.2d 614, 615 (1st Dep't 1999). Plaintiff has

not made an evidentiary showing that the alleged conduct caused any

mental or physical symptom or injury that would indicate the

existence of severe emotional distress.[14]

I.  Deprivation of Civil Rights

Plaintiff's complaint also does not state a claim under 42

U.S.C. § 1983 for violation of plaintiff's constitutional rights

---

[14] Nor can this claim be cast as one for breach of the
covenant of good faith and fair dealing. See Compl. ¶ 40 (alleging
breach of good faith). In order to state a claim for breach of the
covenant of good faith and fair dealing, a party much show that
another party to the contract acted so as to prevent the breaching
party from performing its contractual obligations. See UCC § 1-
304; see also Aventine Inv. Mgmt., Inc. v. Canadian Imperial Bank
of Commerce, 697 N.Y.S.2d 128, 130 (2d Dep't 1999)(citations
omitted) ("the plaintiff must allege facts which tend to show that
the defendant sought to prevent performance of the contract or to
withhold its benefits from the plaintiff"). Since plaintiff has not
alleged that Sikh Federal did anything to cause his failure to pay
his loan, there is therefore no breach of this covenant.

under color of state law (Fifth and Eighth Causes of Action).
"Because the United States Constitution regulates only the
Government, not private parties, a litigant ... who alleges that
her constitutional rights have been violated must first establish
that the challenged conduct constitutes state action." Grogan v.
Blooming Grove Volunteer Ambulance Corps, 768 F.3d 259, 263 (2d
Cir. 2014) (internal quotation marks omitted).  "'To demonstrate
state action, a plaintiff must establish both that [1] her alleged
constitutional deprivation was caused by the exercise of some right
or privilege created by the State or by a rule of conduct imposed
by the State or by a person for whom the State is responsible, and
[2] that the party charged with the deprivation is a person who may
fairly be said to be a state actor.'"  Benzemann v. Citibank N.A.,
622 F. App'x 16, 17 (2d Cir. 2015) (quoting Grogan, 768 F.3d at
263-64).

Federal courts have repeatedly held that private self-help
under § 9-609 does not give rise to state action.  See, e.g.,
Shirley v. State Nat'l Bank of Conn., 493 F.2d 739 (2d Cir. 1974)
(repossession of a automobile by holder of installment contract
after buyer's default); Liberty Mortgage Banking, Ltd. v. Federal
Home Loan Mortgage Corp., 822 F. Supp. 956, 961 (E.D.N.Y. 1993);
Wright v. National Bank of Stamford, 600 F. Supp. 1289, 1298
(N.D.N.Y.), aff'd, 767 F.2d 909 (1985).  Likewise, New York State
courts have also held that a creditor repossessing collateral
pursuant to Article 9 of the UCC is not engaged in state action

under the federal Constitution.  See, e.g., Jefferds v. Ellis, 522 N.Y.S.2d 398, 400-01 (4th Dept. 1987) (holding that "peaceable self-help remedies by secured creditors do not involve 'state action' but, rather, constitute private action not governed by the Fourteenth Amendment").  In the related context of private security guards, courts recognize that while "a police officer's self-identification and use of a service pistol could constitute acting under color of state law, the action at issue must be 'made possible only because the wrongdoer is clothed with the authority of state law.'"  Cancel v. Amakwe, 551 F. App'x 4, 6-7 (2d Cir. 2013) (quoting West v. Atkins, 487 U.S. 42, 49 (1988)).

Here, although Mastrogiacomo may have misrepresented his identity and position as a police officer, such allegations are not sufficient to convert actions in repossessing the vehicle into ones performed under color of state law.  See, e.g., Barrett, 189 F.2d at 303 (presence of genuine law officer at repossession to prevent breach of peace did not convert repossession into state action for purpose of imposing liability under 42 U.S.C. § 1983).

Finally, to the extent plaintiff seeks to sue for due process violations because of the means by which the repossession was accomplished, agreements providing for use of the self-help repossession remedies permitted by § 9-609 do not violate due process.  See Jefferds, 522 N.Y.S. 2d at 399-401 (remedies granted under § 9-503 are constitutional); Crouse v. First Trust Union Bank, 448 N.Y.S.2d 329, 330 (4th Dep't 1981) (agreement authorizing

secured party to seize automobile in event of default without judicial process in accordance with UCC not a violation of due process).

    J. Conversion and Trespass

    Plaintiff also asserts as his Fourth and Sixth Causes of Action common-law tort claims for trespass and conversion arising from the events of the repossession.  However, plaintiff overlooks the simple fact that defendant had the right to possession upon his default.  Also, each of these claims fails because the party who was alleged to have committed these torts, the individual who repossessed the car, is admittedly an independent contractor, and Sikh Federal and the NCU have no liability, under the present circumstances, apart for any liability they may have under § 9-609 for any such contractor's acts.  See Cichon v. Brista Estates Assocs., 597 N.Y.S.2d 819, 820 (3d Dep't 1993)(absent proof that party engaged an unqualified or careless contractor, party is generally not liable for tortious acts of an independent contractor).

III. Motion to Amend

    Instead of responding to the summary judgment motion on the facts, plaintiff seeks here to amend his Complaint to assert a total of thirty-two causes of action.  Leave to amend should be freely granted when "justice so requires."  Fed. R. Civ. P. 15(a); see Foman v. Davis, 371 U.S. 178, 182 (1962).  This generous

standard applies with particular force to pro se litigants. "[A]
pro se complaint is to be read liberally," and should not be
dismissed without granting leave to amend at least once when such a
reading "gives any indication that a valid claim might be stated."
Gomez v. USAA Fed. Sav. Bank, 171 F.3d 794, 795 (2d Cir. 1999)
(quotation omitted).  Thus, while "futility" is a valid reason for
denying a motion to amend, John Hancock Mutual Life Ins. Co. v.
Amerford Int'l Corp., 22 F.3d 458, 462 (2d Cir. 1994), this is true
only where it is "beyond doubt that the plaintiff can prove no set
of facts in support" of his amended claims.  Pangburn v.
Culbertson, 200 F.3d 65, 70-71 (2d Cir. 1999) (citing Ricciuti v.
N.Y.C. Transit Auth., 941 F.2d 119, 123 (2d Cir. 1991)) (internal
quotation marks omitted).

     However, the denial of leave to amend remains proper under
circumstances where granting leave would be unproductive or futile
or where the proposed amendments would be meritless.  Hafez v.
Avis Rent A Car System, Inc., 242 F.3d 365, 2000 WL 1775508, at *2
(2nd Cir. 2000) (unpublished opinion).  In evaluating whether the
proposed amended complaint is meritless, the court must accept as
true all factual allegations in the complaint and draw all
reasonable inferences in plaintiffs' favor.  King v. Simpson, 189
F.3d 284, 287 (2d Cir. 1999).  Denial of the application is not
appropriate unless it appears beyond doubt that the plaintiff can
prove no set of facts in support of his claim which would entitle
him to relief.  Milanese v. Rust-Oleum Corp., 244 F.3d 104, 110

(2d Cir. 2001). "This rule applies with particular force where the plaintiff alleges civil rights violations or where the complaint is submitted pro se." Chance v. Armstrong, 143 F.3d 698, 701 (2d Cir. 1998). Courts must construe pro se pleadings broadly, and interpret them to "raise the strongest arguments that they suggest." Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996)(internal quotation omitted).

Plaintiff's proposed amendment suffers from infirmities which are not correctable, and indicate that the amendment would indeed be futile. First, to the extent the proposed amended complaint essentially repeats the allegations of the original complaint in Counts 1, 2, 4-6, and 8-13, discovery on those issues is complete and those allegations have been the subject of a summary judgment motion and, as discussed above, are without merit.

Second, to the extent plaintiff in proposed causes of action 3,[15] and 14-20 seeks to bring claims against new defendants (Ram R. P. Singh, Surinder Singh, On the Job and Tony Cera) based on the same transactions as are alleged in the Complaint, those claims, which were raised over six years after commencement of this action are clearly futile because they are time-barred. Very simply, all those claims have statutes of limitation that are shorter than the six years and three months that passed between the filing of the original complaint and the submission of the proposed amended

_____

[15] Count 3 is new only in that it seeks to add claims relating to the same causes of action against Ram R. P. Singh personally.

complaint.[16]

However, this Court next examines whether the time barred
claims against these new defendants "relate back" to a timely filed
complaint.  See Fed. R. Civ. P. 15(c).  The goal of relation-back
is "to prevent parties against whom claims are made from taking
unjust advantage of otherwise inconsequential pleading errors to
sustain a limitations defense."  Advanced Magnetics, Inc. v.
Bayfront Partners, Inc., 106 F.3d 11, 19 (2d Cir. 1997) (quoting
Fed. R. Civ. P. 15 Advisory Committee Note (1991)) (internal
quotation marks omitted).  Rule 15(c) of the Federal Rules of Civil
Procedure describes the requirements necessary for an amended
complaint to relate back to an original complaint:

---

[16] Because jurisdiction is predicated on diversity of
citizenship, this court "must apply the choice-of-law rules of [New
York,] the forum state," and, as required "[u]nder New York law, .
. . apply the rules of decision that are considered 'substantive,'"
including New York's borrowing statute.  Thea v. Kleinhandler, 807
F.3d 492, 497-98 (2d Cir. 2015).  This Court need not engage in a
choice of law analysis, since under either the laws of New York or
New Jersey, plaintiff's proposed new claims are time barred, absent
relation back.  See, e.g., Christine Falls Corp. V. U.S. Bank Nat'l
Ass'n, 546 F. App'x 13, 16 (2d Cir. 2013) (under New York law, a
three year statute of limitations applies to conversion claims and
six years for constructive fraud); Pinaud v. County of Suffolk, 52
F.3d 1139, 1156 (2d Cir. 1995) (applying the New York three year
limitations period for personal injury claims brought under civil
rights statutes); Sanusi v. Dep't of Homeland Sec., No. 06 CV
2929(SJ)(JMA), 2010 WL 10091023, at *17-21 (E.D.N.Y. Dec. 1, 2010),
adopted as modified, 2014 WL 1310344 (E.D.N.Y. Mar. 31, 2014)
(noting that one, two, three or six year statute of limitations
periods are prescribed under New Jersey or New York law for various
torts, including claims for intentional infliction of emotional
distress, conversion, unjust enrichment); Ctr. Cadillac, Inc. v.
Bank Leumi Tr. Co. of New York, 808 F. Supp. 213, 226-27 (S.D.N.Y.
1992, aff'd, 99 F.3d 401 (2d Cir. 1995) (noting six years
limitations period under New Jersey law for common-law fraud and
breach of contract claims).

(1) An amendment of a pleading relates back to the date
   of the original pleading when . . .
        (B) the amendment asserts a claim or defense that
   arose out of the conduct, transaction, or occurrence set
   out -- or attempted to be set out -- in the original
   pleading, or
        (C) the amendment changes the party or the naming of
   the party against whom a claim is asserted, if Rule
   15(c)(1)(B) is satisfied and if, within [120 days of
   filing the complaint], the party to be brought in by
   amendment (i) received such notice of the action that it
   will not be prejudiced in defending on the merits; and
   (ii) knew or should have known that the action would have
   been brought against it, but for a mistake concerning the
   proper party.

   There are thus three requirements that must be met before an

amended complaint that names a new party can be deemed to relate

back to the original timely complaint:  (1) both complaints must

arise out of the same conduct, transaction, or occurrence; (2) the

additional defendant must have been omitted from the original

complaint by mistake; (3) the additional defendant must not be

prejudiced by the delay.  See Hogan v. Fischer, 738 F.2d 509, 518

(2d Cir. 2013).

   With regard to the claims against new defendants based on the

same transactions as are alleged in the complaint, there is no

indication that any such new defendant was omitted from the

complaint within the statutory time period by mistake.  Indeed,

plaintiff clearly knew the identities of each of these defendants

within the statutory time period.[17]  The determination to omit

_____

        [17]  For example, plaintiff clearly knew of the existence of On
the Job and "Tony Cera" either before or immediately after the
complaint and answer were filed.  See Pl. Dep. at 80-81 (alleging
on November 18, 1994 that police officer "Walsh" told him real name
                                                    (continued...)

these parties for over seven years cannot be viewed as a mistake, excusing the passage of the statute of limitations. See, e.g., Cornwell v. Robinson, 23 F.3d 694, 705 (2d Cir. 1994) (where plaintiff could not, in light of record in case, tenably claim that she did not know the identities of various parties plaintiff could not amend complaint to add additional defendants).

Third, to the extent plaintiff seeks to bring new claims against new parties based on transactions outside the scope of the complaint (in Counts 16 and 25 through 32),[18] plaintiff fails to specify in his proposed amended complaint when the pertinent events occurred. Irrespective of whether the new claims against the various collection agencies or Inderbir Singh Gill might conceivably not be time barred, none of the events have anything to do with the issues currently before the Court, and there is no reason to make such claims part of the present proceeding. See 28

_____

[17] (...continued)
of individual who effected repossession); Answer ¶ 11 (alleging repossession was accomplished by employee of On the Job). Moreover, any such information of which plaintiff was unaware would have been readily available to plaintiff through timely third-party discovery. Further, the allegations of the original complaint and testimony at deposition reveal plaintiff knew of the existence and activities of Surinder Singh and Ram R.P. Singh by the time of the complaint.

[18] The claims against Inderbir Singh Gill (Count 16) and the claims relating to the loan to Inderbir Singh Gill guaranteed by plaintiff (Count 23, 23 and 32) are not part of the present dispute; that loan is not part of the $24,282.69 debt at issue. See Pl. Dep. at 99-102 (parties discuss that this debt, which Inderbir Singh Gill made and plaintiff guaranteed, is not part of the present suit). Similarly, the claims against the collection agencies are entirely new (Counts 25-32 of the proposed amended complaint).

U.S.C. §§ 1367(a) (supplemental jurisdiction over new party does not exist where claims are not part of the same Article III case or controversy); 1367(b), 1367(c)(3)(even where claims are part of the same case or controversy, court may decline supplemental jurisdiction where it has "dismissed all claims over which it has original jurisdiction"). Indeed, it appears that such new claims against new parties based on new transactions would not even be properly venued in this district, since there is no allegation as to those parties' residence, or the location of the events alleged by plaintiff. See 28 U.S.C. § 1391.

Finally, to the extent the plaintiff seeks to bring new claims against the NCUA and Sikh Federal, who are already parties here, or against the director of the NCUA (who is charged with the acts of the NCUA), the proposed claims are without merit. Plaintiff alleges in Cause of Action Twenty-one that the NCUA "witness tampered" under 18 U.S.C. § 1512 with plaintiff in attempting to collect the debt even though it had been paid in full. However, no private right of action is granted under that criminal statute. See Bender v. City of New York, No. 09 CV 3286 (BSJ), 2011 WL 4344203, at *2 (S.D.N.Y. Sept. 14, 2011); Bender v. General Servs. Admin., No. 05 Civ. 6459 (GEL), 2006 WL 988241, at *1 (S.D.N.Y. Apr. 14, 2006). Similarly, in proposed Cause of Action Seven, plaintiff alleges that Sikh Federal failed to surrender the license plates of the vehicle upon repossession as required by law. However, plaintiff has not pointed to any specific authority, and

we are unable to locate any authority, that would give rise to a private right of action as a result of any such failure to comply with the rules of the Taxi and Limousine Commission or the New York or New Jersey State Department of Motor Vehicles.

Plaintiff also alleges in Cause of Action Twenty-Two of the proposed amended complaint that the NCUA violated the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq. by incorrectly reporting to "a major consumer rating agency" that the monies at issue remain unpaid. Section 1681s-2 of that Act provides in relevant part:

> A person shall not furnish any information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe that the information is inaccurate.

15 U.S.C. § 1681s-2(a)(1)(A). In the present case, this court finds that there is no material issue of fact that plaintiff does indeed owe $24,282.69 that remains unpaid. As such, the reporting made by the NCUA did not violate the statute because the information reported (that the loan was unpaid) was accurate.

In sum, summary judgment is granted in favor of defendant dismissing all of plaintiff's claims in the Complaint and plaintiff's motion to amend is denied. In addition, summary judgment is granted in favor of defendant on its counterclaim in the amount of $24,282.69, less the value of the vehicle when it was repossessed on February 18, 1993, and interest from that date until entry of judgment.

In light of the difficulty of assessing the value of the vehicle given that NCUA's knowledge appears to be limited to

-43-

documents in the files of Sikh Federal after the takeover, and the passage of time, the value of the vehicle shall be based on median retail value of of the vehicle reflected in the Kelley Blue Book at the time of the repossession.  See *In re* Martinez, 409 B.R. 35, 38 (Bankr. S.D.N.Y. 2009) (noting that "Kelley Blue Book printout constitutes competent evidence of the Chevrolets replacement value"); *In re* Gonch, 435 B.R. 857, 861–62 (Bankr. N.D.N.Y. 2010) (accepting the admissibility of the Kelley Blue Book value and noting that it is trustworthy and generally relied upon by the public); see also Agbaje v. Bah, No. 09 Civ. 6201(DLC)(RLE), 2010 WL 6370541, at *4 n.3 (S.D.N.Y. Dec. 23, 2010), adopted, 2011 WL 1197641 (S.D.N.Y. Mar. 25, 2011) (referring to Blue Book value in assessment of reasonableness of the prices of three automobiles). In the alternative, at the option of NCUA, it may determine the value of the vehicle at the time of repossession by using the original purchase price of the vehicle, depreciated by 20% for one year of use or by the method allowed under the applicable regulations of the U.S. Treasury Department for depreciation of automobiles.  See Hertz Corp. v. United States, 364 U.S. 122, 124 (1960) (approving use of the applicable Treasury Regulations on Depreciation, 26 C.F.R. § 1.167(a)-1(b)).

However, no credit shall be given for plaintiff's personal possessions in the vehicle in light of the express language in the Security Agreement that "the Credit Union will not be responsible for any of [plaintiff's] property not covered by this Agreement

that you leave inside the collateral." In any event, the property is of de minimus value. When plaintiff was questioned during his deposition about the value of personal property in the car, he responded that he had, inter alia, papers in his glove compartment, band aids, scissors, tools, some personal books and tokens, besides the radio, vouchers and other items relating to his work as a limousine driver. See Pl. Dep. at 112-13. He was asked to insert a value for the items not returned to him, but never provided a value when he returned the signed deposition along with a very detailed and lengthy "List of Discrepancies Found in My Deposition Given on Nov. 18, 1994," which he also signed. See Pl. Dep. at 115 (request); Pl-Dep. Ex. D (list).

<u>CONCLUSION</u>

Defendants are granted summary judgment on their counterclaim and plaintiff's cross-motion for leave to amend is denied.

The Clerk of the Court is respectfully requested to enter judgment accordingly. A copy of this order will be electronically filed and a copy mailed to the plaintiff.

SO ORDERED.

Dated:   Brooklyn, New York
         October 16, 2018

                              /s
                              MARILYN D. GO
                              UNITED STATES MAGISTRATE JUDGE

Copies mailed to:

Amardepp Singh Gill
c/o Ms. Jasbir Kaur
4226 Stage Coach Lane
Garland, Texas  75043
Plaintiff <u>pro</u> se


Roger Goodnaugh, Esq.
Torre, Lentz, Gamel, Gary & Rittmaster, LLP
100 Jericho Quadrangle, Suite 309
Jericho, NY 11753-2702
Attorney for Defendant (via ECF)